# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IHOP FRANCHISING, LLC, as successor        )
in interest to International House of        )
Pancakes, Inc.; IHOP PROPERTY LEASING,       )
LLC, as successor in interest to IHOP       )
Properties, Inc.; IHOP IP, LLC;        )
and INTERNATIONAL HOUSE OF        )         CIVIL ACTION
PANCAKES, LLC,        )
        )         Case No. 13-2641-KHV-TJJ
                        Plaintiffs,        )
v.        )
        )
WAJDI TABEL,        )
                        Defendant.        )

## REPORT AND RECOMMENDATION

### NOTICE

The parties are reminded that, within fourteen (14) days after being served with a copy of this Report and Recommendation, any party, pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), may file written objections to this Report and Recommendation. A party must file any objections with the clerk of the district court within the fourteen-day period if that party wants to have appellate review of the proposed findings of fact, conclusions of law, or recommended disposition. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

## I.    NATURE OF THE MATTER BEFORE THE COURT

On December 16, 2013, Plaintiffs IHOP Franchising, LLC and related entities filed their Verified Complaint against an IHOP franchisee or former franchisee, Defendant Wajdi Tabel. The Verified Complaint alleges claims against the Defendant on seven counts: (1) Breach of Contract–Franchise Documents; (2) Ejectment; (3) Lanham Act–Trademark Infringement; (4)

Lanham Act–Unfair Competition; (5) Common Law Trademark Infringement; (6) Common Law Unfair Competition; and (7) Declaratory Judgment.

On December 27, 2013, Plaintiffs filed their Motion for Preliminary Injunction (ECF No. 7). Plaintiffs ask the Court to enter a preliminary injunction pursuant to Fed. R. Civ. P. 65 ordering Defendant Tabel, and those acting in concert with him, to immediately cease operating the IHOP restaurant located at 15410 West 119th Street, Olathe, Kansas ("the Restaurant"), and to surrender possession of IHOP's Marks, and the Restaurant premises, inventory, marketing materials, equipment, and proceeds.

Plaintiffs assert that they are entitled to a preliminary injunction because Defendant breached his IHOP franchise agreement by: (a) failing to honor Plaintiffs' right of first refusal to purchase the Restaurant, and (b) improperly and secretly assigning the Restaurant without Plaintiffs' consent. For these reasons, Plaintiffs terminated Defendant's franchise, which Plaintiffs assert triggered post-termination obligations that Defendant breached and is continuing to breach under the terms of the Franchise Agreement, including namely obligations to cease operation of the Restaurant, to surrender the premises and equipment to Plaintiff, and to discontinue use of Plaintiffs' trademarks, marketing materials, and other items identified in the Franchise Agreement.

On January 7, 2014, Defendant filed a motion to dismiss or in the alternative to stay Plaintiffs' motion for preliminary injunction and verified complaint (ECF No. 12). He argued that Plaintiffs' motion for preliminary injunction and verified complaint were improper and should be dismissed or in the alternative stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362, triggered by his May 24, 2011 Chapter 11 bankruptcy filing (D. Kan. Bankr. Case No. 11-21551). On March 13, 2014, District Judge Vratil overruled the motion to dismiss and

referred Plaintiffs' motion for preliminary injunction to the undersigned Magistrate Judge for a Report and Recommendation (ECF No. 16).

On March 26, 2014, the undersigned Magistrate Judge held an evidentiary hearing on the motion. Plaintiffs appeared through counsel and its representatives. Defendant appeared only through counsel. Plaintiffs presented evidence at the hearing consisting of the testimony of three witnesses and 28 exhibits. Although Defendant filed a Witness List (ECF No. 20) listing Defendant Tabel and the Restaurant manager Candy Hill, neither of these witnesses appeared at the hearing. Nor did Defendant offer any exhibits or any other evidence at the hearing. Following presentation of the evidence, the Court took the motion under advisement for the preparation of a Report and Recommendation.

On April 7, 2014, the Court initiated a telephone conference with the parties to discuss whether RR Group LLC and/or Alex Harb, which the evidence indicated might have interests in the Restaurant, were indispensable parties under Fed. R. Civ. P. 19(a)(1), and whether they were entitled to notice as an "adverse party" under Fed. R. Civ. P. 65(a)(1). In addition, the Court obtained clarification from Plaintiffs on the precise relief being requested, and how Plaintiffs contemplate that relief would be enforced. After hearing from counsel on these issues, the Court issued a Notice and Show Cause Order to RR Group LLC and Alex Harb, giving them notice of this action and of Plaintiffs' pending Motion for Preliminary Injunction, along with a deadline by which they must show cause in writing filed with the Court why the preliminary injunction should not issue and identifying their interest, if any, in the Restaurant. On April 10, 2014, RR Group LLC and Alex Harb filed a response to the Show Cause Order (ECF No. 29) stating that they do not have any ownership interest in or operational involvement with the Restaurant and do not have any interest in IHOP's trademarks, inventory, marketing materials, equipment or

proceeds located in the Restaurant or associated premises. They further stated they do not object to the issuance of the preliminary injunction.

Defendant's answer was due within fourteen days after the Court denied Defendant's motion to dismiss on March 13, 2014.[1] Although more than fourteen days have passed since his motion was denied, Defendant has not filed an answer. On April 2, 2014, Plaintiffs requested an entry of default against Defendant under Fed. R. Civ. P. 55(a). The Clerk entered Entry of Default against Defendant on April 3, 2014 (ECF No. 24).

It is against this backdrop that the Court now issues this Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction.

## II. FINDINGS OF FACT

### A. History and Pertinent Provisions of the Franchise Agreement

Plaintiffs are franchisors of the nationally recognized IHOP restaurants. Since 1998, an IHOP franchisee has maintained a restaurant located at 15410 West 119th Street, Olathe, Kansas and identified as IHOP #5321("the Restaurant"). In 2005, the franchisee operating the Restaurant at the time assigned all of his interest in the Restaurant to Defendant Tabel. Pursuant to that assignment, Defendant executed a franchise agreement ("Franchise Agreement")[2] with International House of Pancakes, Inc. ("IHOP")[3] and assumed all of the prior franchisee's duties and obligations under a sublease for the premises and an equipment lease.

---

[1] *See* Fed. R. Civ. P. 12(a)(4)(A).

[2] Prelim. Inj. Hr'g Ex. 5.

[3] Defendant's 2005 Franchise Agreement was with the entity International House of Pancakes, Inc., which was the predecessor in interest to current named Plaintiff, IHOP Franchising, LLC. The Court will refer to this entity as "IHOP" and refer to the collective group of named party plaintiffs as "Plaintiffs."

Sections 11.02 and 11.03 of the Franchise Agreement permitted Defendant to assign, transfer, or sell his interest in the Franchise Agreement and Restaurant under limited circumstances, subject to the requirements that Defendant serve written notice of the proposed assignment upon IHOP and obtain IHOP's written consent to the assignment. Section 11.03(b)(iii) required the franchisee Defendant to retain at all times legal and beneficial ownership of at least 51% of all outstanding stock of any assignee, absent written agreement by IHOP. Section 11.04 provided IHOP with the right of first refusal for thirty days after receipt of such notice (or thirty days after receipt of requested additional information), which permitted IHOP, at its option, to accept the proposed assignment to itself or its nominee, upon the terms and conditions specified in the notice of proposed assignment.

The Franchise Agreement permitted IHOP to terminate the agreement after providing notice of default and Defendant's failure to cure such default and, in the case of an incurable breach, to terminate immediately and without notice. Under Section 12.02 of the Franchise Agreement, an attempt by the franchisee to assign the Franchise Agreement without prior written consent of the franchisor would constitute an incurable breach permitting IHOP to terminate the agreement immediately without notice. Attempts to assign IHOP's trademarks or to permit another entity to use the trademarks would also constitute an incurable breach.

The Franchise Agreement also imposed certain post-termination obligations on Defendant. Upon termination, Section 16.02 required Defendant to discontinue use of IHOP's trademarks, and to cease operating or doing business under any name or in any manner that might give the impression to the general public that Defendant is continuing to operate an authorized restaurant. The agreement also required Defendant, upon termination of the Franchise Agreement, to refrain from using any trade secrets, procedures, techniques or materials

acquired under the agreement, and to return and surrender the trademarks and other items to IHOP. Section 8.09 required that upon termination of the Franchise Agreement, Defendant deliver and surrender to IHOP all manuals, bulletins, instruction sheets, forms, marks, devices, and trademarks.

The Sublease for the Restaurant allows IHOP to terminate the sublease upon "any breach by Subtenant of [the] Sublease, the Franchise Agreement, the Equipment Lease or the promissory note(s)."

### B.     Touffaha Purchase Agreement

On October 5, 2012, Defendant sent an email to Cathy Celano, an employee in IHOP's franchise administration department, stating that he intended to sell his franchise in the Restaurant to Mohamad Touffaha.[4]

On November 28, 2012, Defendant forwarded to IHOP's franchise department a signed purchase agreement between Defendant, as seller, and Mohamad Touffaha, as buyer ("Touffaha Purchase Agreement").[5] It purported to provide the terms and conditions under which Defendant sold and assigned the Restaurant to Touffaha, including the Sublease, Equipment Lease, and Franchise Agreement. Section 24 of the Touffaha Purchase Agreement provided that "[i]n the event IHOP International fails to approve of the transfer of the IHOP franchise from Buyer to Seller, then the parties agree the Seller shall transfer to Buyer of [sic] 49% of the subject IHOP franchise." The Touffaha Purchase Agreement was signed by both Defendant and Mohamad Touffaha and dated October 29, 2012.

---

[4] The body of the email actually spells Mr. Touffaha's name as "Mohammed Tiffaha." Pl.'s Hrg Ex. 6. The evidence presented indicates this was a spelling error and that Defendant actually meant Mohamad Touffaha (who was one of the recipients of the email).

[5] Prelim. Inj. Hr'g Ex. 7.

IHOP notified Defendant by letter dated December 24, 2012 that it would exercise its right of first refusal under the Franchise Agreement to acquire the Restaurant on the terms provided in the Touffaha Purchase Agreement.

On December 28, 2012, Defendant's attorney emailed a letter to IHOP stating that the buyer, Touffaha, had "rescinded and revoked his offer" and "[t]he proposed transaction is null and void of no further force and effect."[6] The letter further stated that Touffaha's revocation "renders the Notice of Exercise of Right of First Refusal no longer effective," and they anticipated a new purchase agreement submitted for approval in the very near future.

IHOP responded to Defendant's letter and stated that the Touffaha Purchase Agreement executed by both parties "was firm evidence that the offer had been accepted," and there was no provision giving Touffaha the unilateral right to terminate the agreement without cause. IHOP further advised Defendant that any subsequent agreement to terminate the Touffaha Purchase Agreement did not nullify or invalidate its exercise of the right of first refusal triggered by the October 29 Touffaha Purchase Agreement.[7]

### C.     2013 Audit

In June 2013, Plaintiffs attempted to perform an unannounced audit of the Restaurant and requested that Defendant make available for inspection and copying various financial and business documents related to Defendant's operation of the Restaurant. Defendant was unable to produce a majority of the requested documents, so the audit was rescheduled and resumed in July 2013. Plaintiffs' auditor, Chris Guerra, conducted the audit of the documents provided by Defendant or the Restaurant's management staff.

---

[6] Prelim. Inj. Hr'g Ex. 8.

[7] Prelim. Inj. Hr'g Ex. 9.

One of the documents provided during the audit was the 2012 federal income tax return for the entity operating the Restaurant.[8] The tax return identified the entity operating the Restaurant as RR Group, LLC with an address of 438 S. Rock Road, Wichita, Kansas, and listing an October 2, 2012 date of incorporation. Schedule K-1 of the return, in the section identifying the company's shareholders and their percentage of ownership, listed Alex Harb as owning 100% of the company's stock ownership for the tax year and identified his address as 438 S. Rock Road, Wichita, Kansas. Nowhere in the return was Tabel identified as having any ownership interest in the Restaurant or RR Group LLC.

The 2012 federal income tax return and Schedule K-1 in particular indicated a change in ownership from Defendant Tabel to RR Group LLC. In contrast to the 2012 return, the 2009 federal income tax return obtained during the audit identified the entity operating the Restaurant at that time as Tabell, Inc. and listed Defendant Tabel as owning 100% of the company's stock ownership.[9]

Another document obtained during the audit was the May 2013 bank statement for the Restaurant, which was mailed to "Ribbit Restaurant Group DBA Ihop 5321" with an address of 438 S. Rock Rd., Wichita, Kansas. IHOP 5321 is the IHOP number assigned to the Restaurant. The November 2012 bank statement also indicated it was for IHOP 5321 but was mailed to Ribbit Restaurant Group at 438 S. Rock Road, Wichita, Kansas.[10]

The Restaurant's W-3 payroll withholding statements for 2011 and 2012 listed the employer as either K&I Tabel, Inc. or Tabell, Inc. In 2012, a new W-3 payroll withholding

_____

[8] Prelim. Inj. Hr'g Ex. 10.

[9] *See* Prelim. Inj. Hr'g Ex. 11.

[10] *See* Prelim. Inj. Hr'g Exs. 12 & 13.

statement was submitted for the Restaurant with the Olathe, Kansas address listed. This statement listed the employer as RR Group, LLC and identified "Abdallah Harb" as the contact person for the company.[11]

The Restaurant's Kansas Retailers' Sales Tax Return for the month of June 2010 lists the business name as Tabell, Inc. The Sales Tax Return for the period January 1, 2013 through March 31, 2013, identifies RR Group LLC as the business name.[12]

Part of the audit of the Restaurant included reviewing and analyzing the Restaurant's financial statements, e.g., profit-and-loss statements, balance sheets, income statements. Defendant provided financial statements covering the period from July 2011 through May 2013. One of the documents provided was a profit and loss statement for January through September 2012 for "K&I Tabel Inc." The statements covering the prior period appear to be for K&I Tabel, Inc. as well. K&I Tabel, Inc. is one of the corporate entities through which Defendant Tabel operated the Restaurant. The formatting and style of statements covering October 2012 through May 2013 changed significantly from the prior statements. The October 2012 and May 2013 statements purport to be for RR Group, LLC.[13]

Ribbit Restaurant Group LLC is a Kansas limited liability company, formed in October 2012, with its registered agent listed as Alex Harb. Ribbit Restaurant Group LLC filed a name change amendment with the Office of the Kansas Secretary of State, changing its name to "RR

---

[11] *Compare* Prelim. Inj. Hr'g Exs. 16 *and* 17.

[12] *Compare* Prelim. Inj. Hr'g Exs. 18 *and* 19.

[13] *Compare* Prelim. Inj. Hr'g Exs. 20 *and* 21.

Group LLC" on December 4, 2012.  Alex Harb was identified as the authorized person on the Name Change Amendment.[14]

**D.    IHOP's Termination of the Franchise Agreement, Sublease, and Equipment Lease**

On November 22, 2013, IHOP served Defendant with a Notice of Termination, stating that it was immediately terminating the Franchise Agreement, Sublease, and Equipment Lease based upon Defendant's incurable breach of the Franchise Agreement by failing to honor IHOP's right of first refusal and assignment of the Restaurant without IHOP's consent. IHOP demanded the Defendant contact it to confirm that he would comply with all post-termination requirements under the Franchise Agreement, including discontinuing use of IHOP's trademarks and operation of the Restaurant.[15]

On December 9, 2013, Plaintiffs served another written notice on Defendant advising him of the termination of the Franchise Agreement and noting his failure to surrender and vacate the Restaurant's premises.  Since receiving the November 22, 2013 Notice of Termination and the December 9, 2013 notice, Defendant has failed and refused to surrender possession of the Restaurant, and related facilities, equipment, and inventory to IHOP.

**E.    Adverse Effects on the Restaurant, IHOP's Trademarks, and Related Property Interests**

IHOP tracks customer complaints for all of its restaurants.  At the hearing, Plaintiffs presented evidence of customer feedback and complaints for the Restaurant for the time period November 1, 2012 to March 23, 2014.[16]  The report listed 44 instances of customer feedback

---

[14] *See* Prelim. Inj. Hr'g Exs. 14 & 15.

[15] *See* Prelim. Inj. Hr'g Ex. 23.

[16] *See* Prelim. Inj. Hr'g Ex. 22.

received by IHOP's corporate center for the Restaurant, many with negative comments. In a few instances, the customers even indicated they would not return to the Restaurant or to IHOP restaurants generally. John Schwartz, IHOP's Director of Multi Unit Operations, testified that when IHOP receives customer complaints, it contacts the franchisee or the person in control to let them know about the complaint and then expects them to contact the guest within two days to rectify and resolve the complaint.[17] He further testified that when he researched whether customer complaints at the Restaurant were being rectified and resolved, he learned that there was no contact made, even on complaints where the customer requested contact.[18]

## III. CONCLUSIONS OF LAW

### A. Standard for Preliminary Injunction

To prevail on their motion for a preliminary injunction, Plaintiffs must establish that four equitable factors weigh in their favor: (1) they are substantially likely to succeed on the merits of their claims; (2) they will suffer irreparable injury if the injunction is denied; (3) their threatened injury outweighs the injury Defendant will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.[19] Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.[20] "A preliminary injunction is an extraordinary remedy never awarded as of right."[21] In each case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting

---

[17] Prel. Inj. Hr'g Tr. 83.

[18] Prel. Inj. Hr'g Tr. 85–86.

[19] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

[20] *Id.*

[21] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

or withholding of the requested relief."[22]  Whether to grant a preliminary injunction rests within the sound discretion of the court.[23]

Section 34 of the Lanham Act, codified as 15 U.S.C. § 1116(a), expressly gives courts vested with jurisdiction the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."[24]

**B.      Factors for Issuance of a Preliminary Injunction**

**1.      Likelihood of Success on the Merits**

In order for Plaintiffs to establish they are substantially likely to succeed on the merits of their claims, they need simply make out "a prima facie case showing a reasonable probability that [they] will ultimately be entitled to the relief sought."[25]  Plaintiffs assert that they are likely to succeed on the merits of their breach of contract claims because they have shown that they properly terminated the franchise documents based upon Defendant's incurable breaches of the Franchise Agreement and that Defendant is continuing to breach by failing to comply with his post-termination obligations.  They further assert that they are likely to succeed on their trademark infringement claims because they have shown that the termination of the Franchise Agreement obligated Defendant to cease using IHOP's trademarks and he continues to use them without authorization in operating the Restaurant.

---

[22] *Id.*(quoting *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542 (1987)).

[23] *See Beltronics*, 562 F.3d at 1070.

[24] 15 U.S.C. § 1116(a).

[25] *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781 (10th Cir. 1964).

Plaintiffs argue that that the Tenth Circuit has adopted a more lenient standard for meeting the likelihood of success requirement if the other three factors are met. The Court need not address that issue here, as it finds that Plaintiffs have established there is a substantial likelihood they will ultimately prevail on the merits of their claims, without the need to apply a more lenient standard.

### (a)        Breach of Contract Claims

Plaintiffs allege in their Verified Complaint that Defendant breached the Franchise Agreement by (1) failing and refusing to honor IHOP's exercise of its right of first refusal under the Franchise Agreement; (2) assigning, transferring, selling, or allowing an unauthorized person to occupy or possess the Restaurant, its premises and its equipment, without Plaintiffs' consent; and (3) failing to comply and perform its obligations following Plaintiffs' proper termination of the Franchise Documents, including failure to surrender the premises, equipment, and marks to Plaintiffs, failure to cease use of the marks and Plaintiffs' trade secrets, and failure to cease operation of the Restaurant.

Plaintiffs have shown that they are likely to succeed on the merits of their breach of contract claims against Defendant. There is compelling and uncontroverted evidence that Defendant failed and refused to recognize IHOP's right of first refusal to acquire the Restaurant, which was triggered when IHOP received notice of Defendant's intended assignment to Touffaha.

The Franchise Agreement required Defendant to serve IHOP with written notice of any proposed assignment, transfer, or sale of his interest in the Franchise Agreement.  Upon receipt of Defendant's notice of his intent to assign his interest, IHOP had a 30-day right of first refusal to accept the proposed assignment upon the terms and conditions contained in the notice. The evidence presented by Plaintiffs shows that Defendant notified IHOP of his intent to sell his

franchise in the Restaurant to Touffaha and the terms and conditions of the sale when he forwarded a copy of the signed Touffaha Purchase Agreement to IHOP, on November 28, 2012. IHOP thereafter notified Defendant by letter dated December 24, 2012 that it would exercise its right of first refusal under the Franchise Agreement to acquire the Restaurant on the terms provided in the Touffaha Purchase Agreement.

Four days later, Defendant notified IHOP that the buyer had "rescinded and revoked his offer." Pursuant to Section 11.04 of the Franchise Agreement, IHOP properly exercised its right of first refusal to accept the proposed assignment within 30 days after it received notice of Defendant's intended assignment to Touffaha. Defendant's subsequent notice that his proposed buyer had rescinded and revoked his offer to purchase Defendant's interest in the franchise does not negate or otherwise impact IHOP's right of first refusal. Plaintiffs have thus shown that Defendant breached the Franchise Agreement by refusing to honor IHOP's exercise of its right of first refusal to acquire the Restaurant under the terms and conditions provided in the Touffaha Purchases Agreement.

Plaintiffs also presented evidence that Defendant breached the Franchise Agreement by assigning, transferring, selling, or allowing an unauthorized person to occupy or possess the Restaurant, its premises and its equipment, without IHOP's consent. There is compelling and uncontroverted evidence obtained during Plaintiffs' audit of tax returns and financial documents for the entities operating the Restaurant—documents obtained from Defendant or Restaurant management employees—that Defendant assigned his interest in the Franchise Agreement in late 2012, without giving written notice to Plaintiffs and without obtaining Plaintiffs' written consent to the assignment.

Regardless of how Defendant structured the transfer or assignment of his interest and

rights under the Franchise Agreement to the entity operating the Restaurant during this time period, he did so without the required written consent of IHOP. From the uncontroverted evidence presented, the Court finds that a company *not* owned 51% or more by Defendant was operating the Restaurant, as well as filing income and sales tax returns for the Restaurant, beginning in October or November 2012, and continuing at least until mid-2013.

In fact, Defendant's only attempt to even challenge Plaintiffs allegations, albeit on cross-examination of Plaintiffs' witnesses and without the benefit of any testimony or evidence, is his contention that Defendant had other entities that operated the Restaurant. Defendant however offered no evidence to support that contention or to show he owned 51% or more of any such entity operating the Restaurant. The documentation obtained by Plaintiffs during their audit provides compelling evidence that Defendant assigned, transferred, or sold his interest in the Franchise Agreement without IHOP's consent and that he did not have any ownership interest in the Restaurant or franchise in November 2012 and into mid-2013.

Defendant's failure to honor IHOP's right of first refusal and his assignment of his rights in the Franchise Agreement without IHOP's consent are incurable breaches of the Franchise Agreement, which triggered IHOP's right to terminate the Franchise Agreement, Sublease, and Equipment Leases with Defendant immediately.[26] Upon termination of the Franchise Agreement, Defendant was required to comply with several post-termination obligations. Some of those include the obligation to discontinue use of IHOP's trademarks, trade secrets, procedures, techniques or materials acquired under the Franchise Agreement, and the obligation to cease operating or doing business under any name or in any manner that might give the impression to the general public that Defendant is operating an authorized restaurant. However,

---

[26] *See* Franchise Agreement § 12.02 (Prelim. Inj. Hr'g Ex. 5) and Sublease § VIII (Prelim. Inj. Hr'g Ex. 3).

despite IHOP's termination of the franchise agreement, Defendant refused and continues to refuse to perform his post-termination obligations under the Franchise Agreement, including his obligations to immediately deliver and surrender full and complete possession of the Restaurant, equipment, and inventory to IHOP. Based on the foregoing, the Court concludes there is a substantial likelihood Plaintiffs will prevail on the merits of their breach of contract claims.

### (b) Trademark Infringement

Plaintiffs have also asserted claims for trademark infringement and unfair competition under the Lanham Act and common law. They allege that following IHOP's termination of the Franchise Agreement, Defendant has continued, without Plaintiffs' consent or authorization, to use IHOP's marks in commerce or in connection with the sale, offering of sale, distribution, and/or advertising of goods and services. Defendant has done so by, among other things, continuing to operate the Restaurant using the marks on signage, menus and documents, advertisements, and equipment. Such use of the marks in interstate commerce, without Plaintiffs' permission or authority, is likely to cause confusion, or to cause mistake, or to deceive the public as to Defendant's status as an IHOP-approved and authorized franchisee.

The unauthorized use of any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in a way that is likely to cause confusion in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act.[27] Nationwide trademark protection fosters competition and product quality by securing to the producer the benefits of a good reputation.[28] It benefits the consumer by preventing confusion about the source of products, and by instilling in consumers the confidence that inferior goods

---

[27] *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006); *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 651 (10th Cir. 1996).

[28] *First Sav. Bank*, 101 F.3d at 651.

are not being passed off by the use of a familiar trademark.[29] In order to prevail on a trademark infringement claim, the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive.[30]

When a franchisee—who once had authorization becomes associated in the public mind with the licensor or franchisor—loses authorization but continues use of the franchisor's mark, the potential for consumer confusion is great because the public is fraudulently "led to think that the ex-licensee is still connected with the licensor."[31] For this reason, it is a "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement."[32] The Eleventh Circuit Court of Appeals, in *Burger King Corp. v. Mason*,[33] has described the danger of customer confusion when a terminated franchisee continues to use the former franchisee's trademarks, and has determined that it satisfies the likelihood of confusion test for trademark infringement:

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. A patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that BKC endorses the operation of the restaurant. Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise therefore

---

[29] *Id.*

[30] 15 U.S.C. § 1114(1)(a).

[31] *7-Eleven, Inc. v. Spear*, No. 10-cv-6697, 2011 WL 830069, at *5 (N.D. Ill. Mar. 3, 2011) (quoting 3 J. McCarthy, *Trademarks and Unfair Competition* § 25.07[1], at 25–48.2 (3d ed.1994)).

[32] *Id. See also Steak n Shake Enters., Inc. v. Globex Co., LLC*, No. 13-cv-01751-RM-CBS, 2013 WL 4718757, at *11 (D. Colo. Sept. 3, 2013) ("It is well established that a terminated franchisee's continued use of the former franchisor's trademarks is likely to cause consumer confusion and constitutes trademark infringement.").

[33] 710 F.2d 1480 (11th Cir. 1983).

would be attributed to BKC. Because of this risk, many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement.[34]

Plaintiffs have shown by competent and undisputed evidence that IHOP was entitled to terminate the Franchise Agreement with Defendant. Upon termination of the Franchise Agreement, Defendant lost all rights to use IHOP's trademarks. As a former authorized franchisee, the Court finds that Defendant's continued, unauthorized use of IHOP's marks will cause consumer confusion and, accordingly, constitute trademark infringement under the Lanham Act.[35] The Court concludes there is a substantial likelihood that Plaintiffs will prevail on their claims for trademark infringement and unfair competition under the Lanham Act.

### 2. Irreparable Harm

The second equitable factor Plaintiffs must establish to prevail on their motion for a preliminary injunction is that they will suffer irreparable injury if the requested injunction is denied. Plaintiffs assert that they will suffer irreparable harm by Defendant's continued infringement of IHOP's trademarks and his continued retention and operation of the Restaurant.

A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[36] "In defining the contours of irreparable harm, case law indicates that the injury

---

[34] *Id.* at 1492–93.

[35] *See 7-Eleven,* 2011 WL 830069, at *5 (holding that unauthorized use of franchisor's marks after franchise agreement terminated will cause consumer confusion and constitutes trademark infringement); *Dunkin' Donuts Franchised Rests. v. Elkhatib*, No. 09 C 1912, 2009 WL 2192753, *5 (N.D. Ill. July 17, 2009) ("where a holdover franchisee . . . utilizes the franchisor's marks, the 'likelihood of confusion is inevitable'"); *Bunn-O-Matic Corp. v. Bunn Coffee Serv.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) ("The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license.").

[36] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

must be both certain and great," and that it must not be merely serious or substantial."[37] Factors which support irreparable harm determinations include: the inability to calculate damages; harm to goodwill; diminishment of competitive positions in the marketplace; and lost opportunities to distribute unique products.[38]

**(a)     Harm from Continued Infringement of Plaintiffs' Marks**

Plaintiffs assert that in the trademark context, potential damages to a business' reputation or goodwill constitute irreparable harm. They argue that allowing Defendant to continue to use IHOP's marks would expose Plaintiffs to severe and irreparable harm to their reputation and goodwill. Because the Franchise Agreement is no longer in effect, Plaintiffs have no power to supervise the Restaurant or exert any control over the Restaurant's appearance, the quality of the food, or the customer service. They contend the entire customer experience at the Restaurant, which directly impacts IHOP's reputation and image, is beyond their reach. This loss of control over IHOP's reputation constitutes the irreparable harm necessary to grant a preliminary injunction.

In trademark infringement cases, a former franchisee's continued use of a franchisor's marks after termination of the franchise agreement "poses a substantial risk to the franchisor's brand reputation and good will."[39] In *TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*,[40] the court reasoned that if an injunction against the continued used of trade and service marks in

---

[37] *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004).

[38] *Id.* at 1263.

[39] *Buffalo Wild Wings Int'l v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011).

[40] 652 F. Supp. 2d 763 (N.D. Tex. 2009).

connection with a franchise is not issued, then the franchisee "loses control over its marks, and it faces a substantial threat to its reputation and the goodwill it has built into its brand. Its name and trademarks also stand to lose significant value if it cannot enjoin terminated franchisees from continuing to use them."[41] The court noted that "[t]he reality of franchise arrangements demonstrate that when a former franchisee continues to pass itself off as licensed franchisee, there is usually a substantial threat of irreparable harm to the franchisor."[42]

The Tenth Circuit has noted that some cases suggest that a preliminary showing of likelihood of confusion alone is a presumptive sufficient showing of irreparable injury to support a preliminary injunction.[43] In 2006, the U.S. Supreme Court in *eBay v. MercExchange, LLC*,[44] called into question whether such a presumption should be applied. The Tenth Circuit has also declined to consider *eBay*'s impact on any presumption or irreparable injury in trademark infringement cases.[45] The Court need not consider how *eBay* might apply in this context, as Plaintiffs have presented sufficient proof, even without the presumption, of the irreparable harm that will result if Defendant is allowed to continue infringing IHOP's Marks during the pendency of this litigation.

Plaintiffs have shown they will suffer irreparable harm if a preliminary injunction is denied and Defendant allowed to continue using IHOP's marks. Without the injunction, Plaintiffs have no control over customers' experience at the Restaurant, bearing the IHOP name.

---

[41] *Id.* at 772.

[42] *Id.*

[43] *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

[44] 547 U.S. 388, 393–394 (2006).

[45] *Lorillard Tobacco Co. v. Engida*, 213 Fed. App'x 654, 657 (10th Cir. Jan. 8, 2007) (unpub.).

Defendant's continued unauthorized usage of IHOP's marks will impact and harm the strong reputation and goodwill associated with IHOP's name. Any unfortunate shortcoming or disappointment a customer may experience at the restaurant will rationally be associated with Plaintiffs and the IHOP brand. Meanwhile, the customers will not know that Defendant is operating the Restaurant without Plaintiffs' authorization. The testimony of Mr. Schwartz, IHOP's Director of Multi Unit Operations, indicated that Plaintiffs are already experiencing some negative effects from Defendant's operation of the Restaurant. Allowing Defendant to continue operating the Restaurant using IHOP's marks and to hold the Restaurant out as an authorized franchise during the pendency of this action poses a significant risk of irreparable harm to Plaintiffs' reputation and goodwill.

**(b)      Harm from Continued Operation of the Restaurant**

Plaintiffs also claim that Defendant's continued retention and operation of the Restaurant premises will cause them irreparable harm. They argue that Defendant's breaches of the Franchise Agreement also constituted breaches of the Sublease and Equipment Lease, thereby entitling Plaintiffs to terminate those leases, Defendant's rights in the Restaurant premises, and his rights in the fixtures and equipment in the Restaurant. Plaintiffs argue that, as the holders of the original and primary leasehold interest in the Restaurant's premises, and as owners of the fixtures and equipment in the Restaurant, they have the legal right to make productive use of their interests and property. Plaintiffs contend that Defendant's refusal to surrender possession of the Restaurant and Plaintiffs' personal property interferes with Plaintiffs' rights and this interference constitutes irreparable harm.

In *RoDa Drilling Co. v. Siegal*,[46] the Tenth Circuit affirmed the lower court's finding that

_____

[46] 552 F.3d 1203, 1210 (10th Cir. 2009).

an investor plaintiff was being deprived of control of its real property during the pendency of the litigation and this constituted irreparable harm.[47]  Other cases in the franchisor/franchisee context, have found the inability of the franchisor to make productive use of its own property constituted irreparable harm.[48]

Plaintiffs have shown that Defendant's breaches of the Franchise Agreement also constituted breaches of the associated Sublease and Equipment Lease. Upon IHOP's termination of those leases in November 2013, Defendant no longer has any rights in the Restaurant premises, or the fixtures and equipment in the Restaurant.  Defendant however has continued to holdover and operate the Restaurant on the leased premises, using the fixtures and equipment described in the Equipment Lease.  Plaintiffs are being deprived of legal right to control the unique franchised real property during the litigation.  This results in Plaintiffs being unable to make productive use of their real property, to take back over the Restaurant, or to franchise it to another franchisee.  Plaintiffs have demonstrated they will suffer irreparable harm if Defendant is permitted to continue his unauthorized possession and operation of the Restaurant during this litigation.

### C.      Balance of Hardships

In addition to showing likelihood of success on the merits and irreparable harm, Plaintiffs must also establish that the balance of hardships favors granting the requested preliminary

---

[47] *Id.*

[48] *See 7-Eleven,* 2011 WL 830069, at *6 (finding that if franchisor deprived of its contractual right to possession of the store during the pendency of the litigation, it could lose the customers and goodwill associated with that location); *Persaud v. Exxon Corp.*, 867 F. Supp. 128, 141 (E.D.N.Y. 1994) (finding irreparable harm where the franchisee continued to occupy the premises, depriving the franchisor of the ability to make productive use of the site).

injunctive relief. This factor requires the threatened injury to Plaintiffs to outweigh the potential harm caused to Defendant as a result of the injunction.

Plaintiffs argue that the balance of equities favors the issuance of a preliminary injunction. They assert that they face significant and irreparable harm to their reputation if a preliminary injunction is denied. They state that they are not seeking to put Defendant out of the restaurant business altogether or to prevent him from competing with Plaintiffs by operating a non-IHOP restaurant at a different location. Rather, Plaintiffs wish only to enforce their rights under the Franchise Agreement, which prohibit Defendant from using IHOP's trademarks, operating or doing business under any name or in any manner that might give the public the impression that the Restaurant is associated with IHOP, or using any of IHOP's procedures, techniques, or materials. They point out that Defendant agreed that, upon termination of the Franchise Agreement, he would abide by each of these conditions. Entry of a preliminary injunction is wholly consistent with Defendant's obligations under federal law and the Franchise Agreement.

The Court agrees with Plaintiffs that the balance of hardships factor favors issuance of the preliminary injunction. Courts have held in similar cases that when a terminated franchisee continues to use the franchisor's trademarks, the threated harm to the franchisor outweighs the threatened harm to the franchisee.[49] Other courts have reasoned the threatened harm to the franchisee is outweighed because it is at least partially self-inflicted by failing to perform under the franchise agreements while enjoying the benefits of those agreements.[50]

---

[49] *TGI Friday's*, 652 F. Supp. 2d at 772–73; *Buffalo Wild Wings*, 829 F. Supp. 2d at 846–47.

[50] *See Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F. Supp. 2d 781, 797 (W.D. Tex. 2009) (finding that that the franchisees' alleged harm was partially self-inflicted and brought upon themselves by failing to perform under the franchise agreements); *Dunkin' Donuts Franchised Rests. LLC v. D & D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1361–62 (M.D. Fla. 2008) (finding that the harm suffered

Defendant made no attempt to present any evidence of any harm he might incur from issuance of the preliminary injunction enjoining him from continuing to operate the Restaurant. Any harm that Defendant may have shown, however, would have been the result of his own actions by refusing to allow IHOP to exercise its right of first refusal under the Franchise Agreement and by assigning his rights under the agreement to another entity without IHOP's consent.

The Court concludes that the threatened harm to Plaintiffs in not issuing the injunction outweighs the potential harm to Defendant of the injunction issuance. If the injunction is not issued, Plaintiffs loses control over its marks and it faces a threat to its reputation and the goodwill it has built into its brand. Its name and trademarks are at risk of loss of significant value if it cannot enjoin a terminated franchisee from continuing to use them.

### D.    The Public Interest.

Finally, the Court concludes that the entry of a preliminary injunction serves the public interest. The unauthorized use of the IHOP brand by Defendant will likely cause customer confusion of the very sort the Lanham Act seeks to prevent. If no injunction is issued and Defendant is allowed to continue operating the Restaurant as an IHOP restaurant, consumers will likely be confused in believing it is still an authorized franchise that will adhere to the same standards as an authorized IHOP franchise. Accordingly, the issuance of the injunction would serve the public interest.

---

by franchisee if preliminary injunction issues is self-inflicted and a result of its own failure to comply with numerous requirements of their executed franchise agreements); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) (finding that franchisee was harmed by the threat of loss of his franchisee, but his self-inflicted harm was far outweighed by the immeasurable damage done to the franchisor by the infringement of its trademark).

# IV.      SECURITY

Federal Rule of Civil Procedure 65(c) provides that a court should issue a preliminary injunction "only if the movant gives a security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  The trial court has "wide discretion" under Rule 65(c) in determining whether to require security.[51]

Neither party has addressed the issue of security under Rule 65(c), suggested any bond amount, or provided any input as to the amount of damages Defendant would sustain should it later be determined that Defendant was wrongfully enjoined.  The Court notes that Defendant has not asserted any counterclaim against Plaintiffs and the Clerk has entered an entry of default under Rule 55(a) against Defendant.  Plaintiffs have also shown a high likelihood of success on their breach of the Franchise Agreement and trademark infringement claims.  Based upon these considerations, the undersigned Magistrate Judge recommends that no bond will be required from Plaintiffs for the issuance of the preliminary injunction against Defendant.[52]

---

[51] *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).

[52] *See TracFone Wireless, Inc. v. Washington,* No. 6:13-cv-1030-Orl-36TBS, 2013 WL 5663599, at *7 (M.D. Fla. Oct. 11, 2013) (no bond required where a high probability of success on the merits of the Lanham Act claims and defendants had no legitimate interest in the continued use of the trademarks); *Sylvan Learning Inc. v. Learning Solutions, Inc.*, No. 1:11-00236-KD-B, 795 F. Supp. 2d 1284, 1304 (S.D. Ala. 2011) (no bond required when licensor had high likelihood of success on trademark infringement claim against former licensee; *Dunkin' Donuts Franchised Rests. LLC v. Shrijee Inv., Inc.*, Nos. 08-12836, 08-14213, 2008 WL 5384077, at *9 (E.D. Mich. Dec. 23, 2008) (no bond need for issuance of preliminary injunction against former franchisees where strength of likelihood of success obviated the need for a bond).

## <u>RECOMMENDATION</u>

For the reasons set forth above, it is recommended that Plaintiffs' Motion for Preliminary Injunction (ECF No. 70) be **GRANTED** and an Order entered:

1.      Directing Defendant, and those acting in concert with him, to surrender possession of and leave the Restaurant premises and facilities located at 15410 West 119th Street, Olathe, Kansas 66062;

2.      Directing Defendant, and those acting in concert with him, to assemble and surrender possession of the inventory, trademarks, service marks, logos, signs, marketing materials, and proceeds of the Restaurant;

3.      Enjoining Defendant, and those acting in concert with him, from:

a.      Using any trademark, service mark, logo, or trade name that is confusingly similar to Plaintiffs' trademarks;

b.      Otherwise infringing upon Plaintiffs' trademarks or using any similar designation, alone or in combination with any other component;

c.      Passing off any of his goods or services as those of Plaintiffs or Plaintiffs' authorized franchisees;

d.      Causing likelihood of confusion or misunderstanding as to the source or sponsorship of his business, goods, or services;

e.      Causing likelihood of confusion or misunderstanding as to his affiliation, connection, or association with Plaintiffs and Plaintiffs' franchisees or any of Plaintiffs' goods or services;

f.      Unfairly competing with Plaintiffs or Plaintiffs' franchisees, in any manner; and

4.      Requiring Defendant to file with the Court and to serve upon Plaintiffs' counsel within ten (10) days of entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which he has complied with such injunction or order.

Dated this 15th day of April, 2014, at Kansas City, Kansas.

<u>s/ Teresa J. James</u>
Teresa J. James
U. S. Magistrate Judge